**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VMR Contractors, Inc., | ) | Case No. 22 B 14211 |
| | ) | |
| Debtor. | ) | Honorable Michael B. Slade |
| | ) | |

**MEMORANDUM OPINION REGARDING DEBTOR'S "MOTION TO AUTHORIZE
THE DEBTOR TO MODIFY THE COLLECTIVE BARGAINING AGREEMENT OF
STRUCTURAL IRON WORKERS LOCAL NO. 1 TO WHICH IT IS A PARTY"**

VMR Contractors, Inc. ("VMR") is a construction sub-contractor that, from 2014-22,

completed many projects in the Chicagoland area and employed many people, most of them

union members.  VMR hit hard times when contractors slow-paid it during the COVID-19

pandemic, leading to this chapter 11 case.  Today, a key obstacle to confirming a plan and

creating a reorganized VMR—by all accounts—is treatment of a certain collective bargaining

agreement ("CBA") between it and Structural Iron Workers Local No. 1 ("Local 1").[1]

I have reviewed the docket and the pleadings and considered the evidence presented by

the parties at the evidentiary hearing.  From that information it appears that the CBA will need to

be rejected.  If it is not, no plan of reorganization is possible, VMR will likely shut down

permanently, and all VMR employees will lose their jobs.  So, it should be in everyone's interest

to permit the CBA to be rejected and agree on go-forward terms of employment for Local 1-

affiliated VMR employees.  I am hopeful that, upon reviewing this opinion, the parties will sit

down, consider the interests they should be considering, and come to agreement.

---

[1]   *See* VMR Exhibits 7–8.  VMR Exhibits 1–8 and IW Exhibits 1–2 were admitted into evidence at the start of the
evidentiary hearing on March 5, 2025.  (*See* Dkt. No. 340, 3/5/25 Hr'g Tr. 6:8–9:5, 25:11-16, 79:10–80:5)

But section 1113 of the Bankruptcy Code, 11 U.S.C. § 1113, imposes "more stringent standards and rigorous procedures for rejecting a collective bargaining agreement than apply to an ordinary executory contract." *In re Mission Coal Co., LLC*, 2019 WL 1024933, at *14 (Bankr. N.D. Ala. Mar. 1, 2019). Section 1113 provides highly detailed, strict procedural and substantive rules, all of which must be followed before a CBA can be rejected. When used correctly, these carefully crafted provisions encourage consensus and provide numerous opportunities for agreement, requiring parties to negotiate in good faith while making clear that CBA rejection is available for debtors (and a risk for unions) where it is necessary as a last resort to confirm a chapter 11 plan.

Here, the Debtor asked for the wrong thing when it started the section 1113 process and did not properly follow the procedural requirements of the statute. I cannot say as a matter of law that Local 1 refused to accept a proposal without good cause when the only proposal made by the Debtor, before filing its motion, was a proposal Local 1 could not technically, as a matter of law, accept. Because the Debtor did not properly follow Congress's exacting procedures, the Debtor's motion (Dkt. No. 297) is denied without prejudice—but if the Debtor follows the proper procedure, a follow-up motion seeking rejection of the CBA (if one is necessary because consensus cannot be reached in the interim) is highly likely to be granted.

I.

"In enacting section 1113, Congress made clear that collective bargaining agreements are a special breed of contract, entitled to special treatment in bankruptcy." *In re Chicago Const. Specialties, Inc.*, 510 B.R. 205, 213 (Bankr. N.D. Ill. 2014). A debtor thus "may assume or reject a collective bargaining agreement only in accordance with the provisions" of 11 U.S.C. § 1113. As described in *In re Am. Provision Co.*, 44 B.R. 907, 909

2

(Bankr. D. Minn. 1984) and followed many times since, a court "shall approve an application for rejection of a" CBA only if the debtor proves that:

    (a)    it made a proposal to the union containing terms that are necessary to permit the debtor's reorganization;

    (b)    the proposal treats all creditors, the debtor and all affected parties fairly and equitably;

    (c)    any proposed modifications to employee benefits are based on the best information available at the time of the proposal;

    (d)    the debtor provides the union with the information needed to evaluate the proposal;

    (e)    the debtor is willing to meet at reasonable times to negotiate;

    (f)    the  debtor confers in good faith in attempting to reach mutually satisfactory modifications;

    (g)    the union declines the proposal without good cause; and

    (h)    the balance of the equities clearly favor rejection.

*Id.*; *see also United Food and Com. Workers Loc. Union Nos. 455, 408, 540 and 1000 v. AppleTree Mkts., Inc. (In re AppleTree Mkts., Inc.)*, 155 B.R. 431, 437–38 (S.D. Tex. 1993) (same); *In re AMR Corp.*, 477 B.R. 384, 406 (Bankr. S.D.N.Y. 2012) (same).  And a Debtor must satisfy *each* of these provisions; section 1113(f) is clear that "[n]o provision of this title" (*i.e.*, the Bankruptcy Code) "shall be construed to permit" a debtor "to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section."

The key to the entire section 1113 process is a carefully crafted proposal made by the debtor to the relevant union.  *See In re Nw. Airlines Corp.*, 346 B.R. 307, 321 (Bankr. S.D.N.Y. 2006) (showing that the proposal offered was "necessary" is "[t]he most fundamental requirement for rejection of a collective bargaining agreement").  This often presents a challenge for debtors because the "proposal" required by the statute is a bit of an oxymoron:  a proposal must be "necessary" to a reorganization, *see* 11 U.S.C. § 1113(b)(1)(A), and yet the debtor must

still be willing to meet to discuss and negotiate over it in good faith, *see* 11 U.S.C. § 1113(b)(2).

One might ask: how can a proposal both be "necessary" to a reorganization and yet still be one a

debtor is willing to in good faith negotiate from (and presumably make changes to) "in

attempting to reach mutually satisfactory modifications of such agreement"? *See id.*

Prior courts interpreting section 1113 have given debtors guidance on how to create the

required "Goldilocks" proposal. First, under the majority approach (led by the Second Circuit),

"the necessity requirement places on the debtor the burden of proving that its proposal is made in

good faith, and that it contains necessary, *but not absolutely minimal*, changes that will enable

the debtor to complete the reorganization process successfully." *Truck Drivers Local 807, Int'l*

*Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Carey Transp. Inc.*, 816 F.2d

82, 90 (2d Cir. 1987) (emphasis added).[2] This gives the debtors some flexibility in deciding

what to propose and how to negotiate from that proposal; a debtor can propose somewhat more

than it "needs" to reorganize so long as it does so in good faith and is willing to discuss what it

proposed (and potential alternatives) in good faith.

Second, to succeed at trial, a debtor will "need only make a showing as to the overall

necessity of the proposal, rather than prove that each element of the proposal is necessary to

reorganization." *Nw. Airlines Corp.*, 346 B.R. at 321 (citing *N.Y. Typographical Union No. 6 v.*

---

[2]    Some courts (led by the Third Circuit) have adopted a higher standard, equating "necessary" with "absolutely necessary." *See In re PJ Rosaly Enters. Inc.*, 578 B.R. 682, 692–93 (Bankr. D.P.R. 2017) (discussing the circuit split between the "necessary, but not absolutely minimal" view followed by the Second Circuit and the "essential" view of the Third Circuit); *In re Walter Energy, Inc.*, 542 B.R. 859, 889 (Bankr. N.D. Ala. 2015) (same); *In re Garofalo's Finer Foods, Inc.*, 117 B.R. 363, 371 (Bankr. N.D. Ill. 1990) (same). Courts adopting the majority approach conclude "that the Second Circuit's test for necessity is more consistent with the history and purpose of § 1113 and with the realities of a reorganization under Chapter 11 than the Third Circuit's 'bare minimum' test." *AppleTree Mkts.*, 155 B.R. at 441; *see also PJ Rosaly*, 578 B.R. at 693 (concluding that the Second Circuit's "interpretation reflects the context in which section 1113 operates and the goals of Chapter 11"). While the Seventh Circuit has not spoken on the issue, the Second Circuit's test makes far more sense to me than the Third Circuit's. In any event, I need not resolve this issue here because the undisputed evidence suggests that rejection is "necessary" under any standard.

4

*Royal Composing Room, Inc. (In re Royal Composing Room, Inc.)*, 848 F.2d 345, 348 (2d Cir. 1988)); *see In re Horsehead Indus., Inc.*, 300 B.R. 573, 584 (Bankr. S.D.N.Y. 2003) (a proposal "must be viewed as a whole, and not by its specific elements"); *In re Alpha Nat. Res., Inc.*, 552 B.R. 314, 334 (Bankr. E.D. Va. 2016) ("A debtor is not required to prove that every part of its proposal is the necessity. . . . The Court will not scrutinize whether each individual modification is necessary."). A court evaluating a debtor's section 1113 proposal must "focus on the total impact of the changes [o]n the debtor's ability to reorganize, not on whether any single proposed change will achieve that result." *AppleTree Mkts.*, 155 B.R. at 441. In fact, in many cases, section 1113 proposals are very complex, and if a debtor were required to justify each element "no proposal could ever be truly 'necessary,' since any single vital element of a proposal can hardly be 'necessary' if it can be replaced by some alternative not included in the package which would achieve the same dollar savings for the debtor." *Royal Composing Room*, 848 F.2d at 348; *see also PBGC v. Falcon Prods., Inc. (In re Falcon Prods., Inc.)*, 354 B.R. 889, 894–98 (E.D. Mo. 2006) (holding that a debtor's request for modification of multiple pension plans must be evaluated in the aggregate and not on a plan-by-plan basis). Thus, during a section 1113 trial, a debtor must only prove that the outcome of the overall proposal is what is "necessary" for reorganization, and not that every single detail within it is "necessary."

Third, given the focus of the exercise—crafting a proposal that, as a whole, is necessary for the debtor to reorganize—a proposal may seek non-economic modifications or simply rejection of a CBA if simple rejection is what is necessary to reorganize. *See, e.g.*, *Carey Transp.*, 816 F.2d at 86, 90 (finding that a proposal including changes to overtime, sick days, workers' compensation, and scheduling rules was "necessary"); *In re Valley Steel Prods. Co., Inc.*, 142 B.R. 337, 340–41 (Bankr. E.D. Mo. 1992) (holding changes to a CBA that increased

5

"flexibility in layoffs, improve[d] the [d]ebtors' dispatch procedures and relax[ed] work rules" were  necessary).  Perhaps the most obvious scenario where simple rejection of a CBA (rather than modification of particular terms) would be necessary to a reorganization is a sale case, where a debtor needs a new owner or investor to reorganize and no new owner or investor is willing to engage in a transaction absent rejection of an existing CBA.  That is a common scenario where the section 1113 process is critical and where courts have permitted rejection. *See, e.g.*, *Mission Coal*, 2019 WL 1024922, at *8 (authorizing rejection when "[i]t appears clear to this Court that that the DIP Lenders will not enter into an APA to purchase the assets while they are encumbered by CBA or post-employment benefit obligations"); *Walter Energy*, 542 B.R. at 891 (same); *In re Karykeion, Inc.*, 435 B.R. 663, 679 (Bankr. C.D. Cal. 2010) (refusing to "evaluate the wisdom" of purchaser's insistence on CBA rejection; the only consideration is "whether [buyer's] purchase of the debtor's assets is necessary and whether they are likely to rescind their offer if their terms are not met"); *Nat'l Forge Co. v. Indep. Union of Nat'l Forge Emps. (In re Nat'l Forge Co.)*, 289 B.R. 803, 810–11 (Bankr. W.D. Pa. 2003) (authorizing rejection when buyer refused to assume CBAs and sale was only way to maximize value).

If the debtor establishes that its proposal is necessary to its reorganization and was based on the best information available and delivered and negotiated in good faith (following the steps described in detail within section 1113), the union must produce sufficient evidence to justify its refusal to accept the proposal.  *E.g.*, *In re Patriot Coal Corp.*, 493 B.R. 65, 112 (Bankr. E.D. Mo. 2013) ("As a practical matter, once the debtors have made their prima facie case, the burden shifts to the union . . . to demonstrat[e] that the union had good cause to refuse the proposal.") The key questions, still, are the necessity and reasonableness of *the specific proposal made by the debtor*.

6

II.

VMR is presumably an acronym for the company's founder, sole owner, and President, Vincent M. Robertson.  Robertson has been an ironworker for 31 years.  (Dkt. No. 340, 3/5/25 Hr'g Tr. 28:22–29:5)  Robertson was also not only a union member, but a member of Local 1 entitled to a pension from the related Structural Iron Workers Local No. 1 Fund (the "Fund"). (*Id.* at 51:12-22)  He testified credibly at the evidentiary hearing on March 5, 2025.

VMR has been in business since 2014.  (*Id.* at 29:6-7)  It specializes in precast, structural iron, and rebar installation during road work.  (*Id.* at 29:8-14)  It employs members of several unions across Illinois, including Locals 1, 75, 76, and 444.  (*Id.* at 29:15-22)  VMR has employed up to 100 people.  (*Id.* at 31:3-10)  VMR won several awards for bringing in jobs on time and under budget.  (*Id.* at 35:5-17)

VMR has been party to several CBAs, including the two that were admitted into evidence at trial.  (Dkt. Nos. 331, 332)  Per the CBAs, VMR must make payroll every week, including union benefits, even if it gets paid by its customers only every 30 days (or if such payments lag). (Dkt. No. 340, 3/5/25 Hr'g Tr. 31:11-23)  And VMR's obligations under the CBAs include making contributions to the Fund (which is not a party to either CBA).  (VMR Ex. 7 at 26–30; VMR Ex. 8 at 30-33)  The CBAs also require VMR to pay "liquidated damages" and interest for missed contributions.  (*E.g.*, VMR Ex. 7 at 29; VMR Ex. 8 at 32)

In 2022, VMR installed rebar on Interstate Highway 294 between 95th Street and Hinsdale.  (Dkt. No. 340, 3/5/25 Hr'g Tr. 32:21–33:5)  It was a "huge job" (*id.* at 32:25) that VMR performed for the general contractor, FH Paschen (*id.* at 33:21-23).  Up front, VMR received a payment to cover some payroll and some materials, including steel.  (*Id.* at 33:10-14) But prices then "skyrocketed" by almost 50%.  (*Id.* at 33:17-20)  While VMR finished "97

7

percent" of the job, FH Paschen did not pay the increased price of steel, nor did it pay VMR for all of the work that VMR did.  (*Id.* at 34:1-10)  FH Paschen's failure to pay drove VMR into bankruptcy.  (*Id.* at 34:24–35:4, 37:18-25)

VMR sought protection under chapter 11 of the Bankruptcy Code on December 8, 2022. (Dkt. No. 1)  On January 17, 2023, it filed its initial report pursuant to 11 U.S.C. § 1188(c). (Dkt. No. 43)  VMR reported that, at the time, it employed 55 union members and was engaged in negotiations with a variety of parties.  (*Id.* at 1–2)  VMR's primary obstacle was that it had substantial receivables, including $667,000 from one customer, it needed to collect.  (*Id.* at 1)

It took VMR some time to present a plan for confirmation.  VMR filed four proposed plans before the first confirmation hearing.  (*See* Dkt. Nos. 95, 123, 196, 242)  VMR intended to pursue confirmation of its Third Amended Plan (Dkt. 242) at a hearing on August 19, 2024. Most of the votes were in favor of the plan.  (*Compare* Dkt. Nos. 260–68, 271 (voting yes) *with* Dkt. Nos. 256, 258–59 (voting no)).  And only one party objected:  the Fund.  (Dkt. No. 255) The Fund had filed a proof of claim for $190,757.69 seeking payments under the CBA.  It argued that if the proposed plan was not rejecting the CBA, it must be assuming, which carried an obligation to cure whatever was owed at the time of assumption.  (*Id.* at 5)  The Fund insisted on the entire $190,757.69 being paid on the date of confirmation.  (Dkt. 340, 3/5/2025 Hr'g Tr. 36:6-10)  VMR's plan did not propose to pay that amount, because it could not.

My predecessor denied confirmation on August 19, 2024.  He was critical of VMR's approach (Dkt. No. 339, 8/19/24 Hr'g Tr. 3:3-12) and walked its counsel through a series of internal inconsistencies in the plan that "could probably be corrected with a little care, the kind of care that hasn't been shown so far" (*id.* at 4:1-3).  More substantively, my predecessor sustained the Fund's objection to confirmation because the proposed plan violated the

8

Bankruptcy Code. As stated above, the Fund filed a proof of claim (*see* VMR Ex. 2) asserting

that $190,757.69 is owed under the CBA. (While not a party to the CBA, the document requires

certain payments to the Fund, *see, e.g.*, VMR Ex. 7, at 26, 29). The proposed plan did not say

whether the CBAs would be assumed or rejected but purported to treat the agreements (and the

Fund's claim) in the plan. As my predecessor described, "VMR doesn't propose in its plan to

have the collective bargaining agreement simply ride through. Instead, VMR proposes to pay the

priority portion of the claim in full on the effective date, whenever that is, and then pay only 5 to

10 percent of the general unsecured portion" which "impairs the Structural Ironworkers' rights

under its [CBA]." (Dkt. No. 339, 8/19/24 Hr'g Tr. 12:1-9) My predecessor gave the Debtor

three options: VMR "can assume the collective bargaining agreement and comply with section

365(b)(1); reject the agreement and comply with section 1113; or let the agreement ride through

the case untouched, leaving the Structural Ironworkers to pursue its $190,757 claim against

VMR post bankruptcy." (*Id.* at 12:10-16)[3]

---

[3]  I have doubts about the availability of the so-called "ride-through" doctrine. Courts invoking the doctrine, which is "purely a creature of case law," state that "executory contracts that are neither affirmatively assumed or rejected by the debtor under § 365, pass through the bankruptcy unaffected." *In re Hernandez*, 287 B.R. 795, 799 (Bankr. D. Ariz. 2002). Most courts applying the doctrine do so to retroactively determine the disposition of a contract where the debtor and/or the court neglected to address it at or before confirmation. *See, e.g.*, *Diamond Z Trailer, Inc. v. JZ L.L.C. (In re JZ L.L.C.)*, 371 B.R. 412, 425 (B.A.P. 9th Cir. 2007); *In re Dura Auto. Sys., LLC*, 628 B.R. 750, 755 (Bankr. D. Del. 2021). In these cases, the doctrine is a legal fix that courts have used to "conveniently" fill the "statutory lacuna for contracts that are not executory," *JZ L.L.C.*, 371 B.R. at 425, or for contracts that, because of an oversight, were not addressed in the case and, after the bankruptcy has concluded, the reorganized debtor and counterparty need clarity as to the status of their contractual relationship and related rights. *See, e.g.*, *Dura Auto. Sys.*, LLC, 628 B.R. at 755; *Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392 (5th Cir. 2001). I am aware of only one case, *Hernandez*, where a court permitted a debtor, during its case, to strategically have a contract "ride through" without assumption or rejection. That case involved what the court called "unusual" circumstances, where the individual debtors' creditors initiated an involuntary proceeding, the license agreement at issue was not assumable under 11 U.S.C. § 365(c), and there had been no default. *Hernandez*, 287 B.R. at 798. After stating "[r]ide-through is not an affirmative choice available to the debtor under § 365," *id.* at 800, the court nonetheless found that because the debtors could not assume the agreement and rejection would "result in significant harm to the Debtors and their creditors," it would "exercise its discretion" and permit the debtors to remove all mention of the license agreement from their plan, allowing for the contract to ride through unaffected by the bankruptcy. *Id.* at 806–07.

In my view, the *Hernandez* court extended this extra-statutory doctrine (to the extent it exists at all) too far. In allowing the debtors to maintain the license agreement post-reorganization notwithstanding its own ruling that

9

III.

Following the denial of confirmation, VMR concluded that assuming the CBA was not an option because it could not cure the amount the Fund claimed would be owed as a result. (Dkt. No. 340, 3/5/25 Hr'g Tr. 43:19-22)  Nor would trying to let the CBA "ride through" be sensible, since VMR would immediately face a claim (and perhaps a suit) from the Fund seeking payment of what it claimed.  The only solution, VMR believed, was the section 1113 process.

So on October 1, 2024, VMR (through counsel) sent a letter to Local 1 (through counsel):

> The purpose for this letter , is to notify you that the Debtor VMR Contractors, Inc proposes to modify (pursuant to 11 U.S.C. §1113) that certain collective bargaining agreement which it entered with the Structural Iron Workers Local No. 1 ("the Union") together with all other associated documents, including those which may commit the Debtor to make benefits contributions to various funds.
>
> The reason for this proposal is that the Debtor is unable to pay the Union's prepetition claims as set forth in amended  proof of claim 19-2 in the amount of $190,757.69. The Debtor request a modification to satisfy this claim that the Union accept $47,179.49 as a priority claim to be paid on the effective date of the plan and to reduce the balance of the claim to a prorated distribution of the debtor's projected income for the next five years.
>
> Attached for Unions consideration are  the following financial documents:
>
> 1.    2022 Tax return  Exhibit 1
> 2.    VMR Year to Date Profit and loss. Exhibit 2
> 3.    Summary of Operating reports. Exhibit 3
> 4.    Five-year  Projections. Exhibit 4
>
> As shown from Exhibit 4, the Debtor will not be able to fund the Unions claim and a modification is necessary to allow the Debtor to operate.
>
> We will await your response for the statutory time period of 14 days before we file a formal motion to modify the collective bargaining agreements.

---

the Bankruptcy Code barred assumption, the court did an end-run around section 365(c).  That provision was enacted to protect certain contract counterparties from having their contracts transferred to a new party not of their own choosing.  Congress explicitly determined that the enumerated categories of contracts deserved protection.  Had Congress wanted a debtor to be able to have those contracts "ride through" bankruptcy if it could show rejection would materially harm the debtor or didn't mean the prohibition to apply where the debtor was an individual, it would have said so.  It did not.  Bankruptcy judges do not have the power to circumvent the Bankruptcy Code when it demands a result we find nonsensical or frustrating.  *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 198 (1988) ("Whatever equitable powers remain in the bankruptcy courts must be exercised within the Code's confines.").  While this legal issue is not directly before me at this time, addressing executory contracts is part of a debtor's obligation to administer its case fully and transparently and I expect debtors to do so during their cases or as part of their plans.

(VMR Ex. 1)  In other words, VMR's proposed "modification" was solely to ask the Fund (through Local 1) to accept a cure payment different from the prompt payment in full required by section 365(b)—*i.e.*, to accept payment of the default according to the terms the proposed plan provides to allowed prepetition claims (which is what the Fund would receive if the CBA is rejected and the Fund's proof of claim is allowed as filed).

VMR's letter made several points confirmed by the trial evidence.  Most importantly, based on the facts as they stood at the time of the letter (and at the time of trial), VMR is unable to immediately pay the Fund $190,757.69 in full and in cash on confirmation of a plan of reorganization (*see* Dkt. 340, 3/5/25 Hr'g Tr. 43:19-22, 49:24–50:2), which is what (according to Local 1 and the Fund) the Debtor would have to do if it assumed the CBA.  The Debtor also attached to its letter the information necessary to evaluate its proposal, which was the most complete and reliable information available at the time.  (*Id.* at 37:1-4, 46:25–47:5)

But there were several problems with VMR's proposal.  Most fundamentally, the proof of claim that had stymied the Debtor's plan of reorganization was filed by *the Fund*, not Local 1. Without making any rulings on any party's legal entitlement in the absence of agreement, Local 1 did not control the Fund and had no ability to force the Fund to accept a cure upon assumption that is less than prompt payment of the entire default provided for under section 365(b)(1).  *Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1151 (7th Cir. 1989) ("[T]he presence of a third-party beneficiary can prevent modification of the contract, once it is properly formed."); *cf. In re George Washington Bridge Bus Station Dev. Venture LLC*, 65 F.4th 43, 54 n.6 (2d Cir. 2023) ("Although we do not need to resolve in this case whether third-party beneficiaries of a contract assumed under § 365(a) can seek [cure] under

11

§ 365(b), there are sound reasons to think that Congress would have wanted third-party beneficiaries to be able to assert cure claims.").

Local 1 and the Fund (who retained the same counsel, despite the conflict of interest) pointed out the problem with VMR's proposal in a joint response letter. "The Pension Fund is a separate and distinct entity from the Union. . . . The Union does not control the Pension Fund." (VMR Ex. 3) "The Union cannot waive its magic wand and wipe away the Debtor's debts to the Funds, which are separate and distinct entities. . . . . Therefore, the Union is unable to accept the Debtor's proposal." (*Id.* at 2)

These two letters (VMR Exhibits 1 and 3) are the entirety of the section 1113 written communications that the parties had prior to the filing of the motion. And from that point in time forward, both VMR and Local 1 engaged in strategic decisions that made little sense. No one from Local 1 asked VMR for any additional information, asked for a meeting, or prepared anything that might assuage the Fund, ensure that it received *something*, or otherwise avoided section 1113 litigation. (Dkt. 340, 3/5/25 Hr'g Tr. 47:15-23) Union leadership orally promised Mr. Robertson that Local 1 "would work with" him, but that "never happened." (*Id.* at 54:13-22) Nor did anyone from the Fund do anything at all.

VMR, for its part, did not take the hint from the Local 1/Fund joint response letter either. The reason for this is unclear. VMR's principal (Mr. Robertson) had contact with Local 1 leadership, but union representatives always told him to "[l]eave it to the legal people, which is our lawyers." (*Id.* at 53:15–54:12) And while VMR considered proposing just rejecting the CBA as it is and starting over with a new agreement containing similar terms and conditions of employment for Local 1-affiliated employees (*id.* at 52:10-12), it never did so.

12

All the while, it seems obvious how VMR could seek, and hopefully obtain by consensus, the relief that it needs.  As Local 1 established during cross-examination of Mr. Robertson, separate and apart from the sums that may or may not be due to the Fund, the CBA merely provided for the compensation and benefits required by Cook County prevailing wage rates.  (*Id.* at 62:2–69:18; *see also* IW Ex. 1 (Local 1 Wage and Benefit Rates) and IW Ex. 2 (Cook County Prevailing Wage Rates)  VMR was not asking Local 1 members to accept any less money or benefits, or more cumbersome work rules, for work in the future than they accepted for work in the past.  (Dkt. 340, 3/5/25 Hr'g Tr. 69:19–70:5)  What VMR was and is asking Local 1 to do, effectively, is to agree that the CBA is rejected so that it can confirm a plan and get out of bankruptcy.  I clarified this in my own questions at the end of Mr. Robertson's testimony:

> The Court:  Just so I'm clear, Mr. Robertson, going forward, if I allowed you to reject this collective bargaining agreement, you're still going to pay the ironworkers their prevailing wages that are reflected in IW 2 and IW 1, right?
>
> The Witness: Yes.
>
> The Court:  So, you're not proposing to make any changes to the go-forward pay and benefits; you just need to reject the agreement to confirm a plan to get out of bankruptcy; is that right?
>
> The Witness:  Correct.  (*Id.* at 75:22–76:8)

There is no evidence that rejection of the CBAs would hurt Local 1 or its members at all. To the contrary, if rejection led to a confirmed plan that served as the backbone of a reorganized VMR, rejection would be the catalyst for dozens of union jobs to survive at essentially the same rates of compensation and benefits that they had previously enjoyed.  All that rejection would do is leave the Fund as an unsecured creditor with rights to assert a claim based on a rejected contract.  *See* 11 U.S.C. § 502(g).  Some of the Fund's claim may be entitled to priority, and the rest of the Fund's claim, if allowed, would be a general unsecured claim.  Local 1 appears to admit this in its opposition brief.  (*See* Dkt. No. 308, Local 1 Opp'n Brief ¶ 18 (the Fund's claim

is for "$190,757.69, of which $47,179.49 is a priority unsecured claim under Section 507(a)(4) and (5) of the Bankruptcy Code")).  Local 1 did not offer any witnesses at trial to explain its thinking.  But if VMR's proposal to reject the CBAs left active workers in the same position and led to a viable entity that could employ them going forward, it is hard to understand how any Local 1 member would object.[4]

That said, simple rejection of the CBA is not what VMR asked for in its proposal.  Mr. Robertson admitted this on cross-examination:

> Q:  [I]n the course of your attempts to modify the CBA, did you ever request any changes to a single term and condition identified in the CBA?
>
> A:  No.
>
> Q:  Rather, in the course of your attempts to modify the CBA, the only modification you sought is a reduction in what's owed to the fund; is that correct?
>
> A:  Correct.  (Dkt. 340, 3/5/25 Hr'g Tr. 70:2-10)

VMR's motion and reply did not ask for simple rejection of the CBA, either.  (*See* Dkt. No. 297, Debtor's Section 1113 Motion ¶ 17 ("The Debtor request[s] authority to Modify the CBA and Benefits Trust to modify the Funds claim to the amount of the priority debt under 11 USC § 507 and reduce the balance of the unsecured claim to the prorate[d] share of the Debtor disposable income."); Dkt. No. 309, Debtor's Reply In Support of its Section 1113 Motion at 6 (confirming that the intent of the Debtor's motion was to modify the treatment of the Fund's claim))

---

[4]   At the hearing on March 5, 2025, I asked counsel who jointly represents Local 1 and the Fund whether he believed the Debtor could confirm a plan and still pay the sum of $190,757.69 at confirmation.  When he responded "yes," I asked what such a plan would look like, and he responded "The plan would look like what's ordered by law.  They're going to have to cure any sort of damages that are owed under the provisions."  (Dkt. 340, 3/5/25 Hr'g Tr. 20:31-21:4)  When I asked "With what money?," counsel had no answer and suggested that unless the Debtor could find a way to pay the Fund $190,757.69 in full and in cash at confirmation, it should shut down.  (*Id.* at 21:5-8)  That sort of answer is exactly the opposite of what Congress expected of unions when it passed section 1113 and directed *everyone* to negotiate in good faith and not insist on the impossible.  It would be bad faith and would not be "good cause" for rejecting any proposal if Local 1 refused to negotiate or agree to rejection unless VMR agreed to pay the Fund's proof of claim in full and in cash upon confirmation.

Local 1 seems to suggest in its opposition brief that there are no circumstances in which the Debtor could accomplish its goal—which is simply to pay whatever priority amount exists within the Fund's claim as a priority claim and treat the remainder as a general unsecured claim. (*See* Local 1 Opp'n Brief, Dkt. No. 308)  Local 1 argues that this would be a "retroactive modification" of the CBA that is "not permitted by Section 1113" (*id.* at 7) and that VMR is "asking this Court to wipe out debts owed to the Trust Funds" (*id.* at 8).  But that is incorrect. Local 1's position, too, defies the Bankruptcy Code.  Rejection of the CBA would create claims, if at all, as of the petition date.  *See* 11 U.S.C. § 502(g).

To the extent Local 1 is arguing that section 1113 only permits *modifications* to specific terms of CBAs, rather than flat-out rejection of such agreements, its argument belies the statute. *See* 11 U.S.C. § 1113 ("Rejection of collective bargaining agreements"), *id.* § 1113(a) (the debtor "may assume *or reject* a collective bargaining agreement only in accordance with the provisions of this section" (emphasis added)), *id.* § 1113(c) ("The court shall approve an application for *rejection* of a collective bargaining agreement only if the court finds that—. . . " (emphasis added)); *see also Garofalo's*, 117 B.R. at 369 ("section 1113(c) references only rejection").  As I described for the parties during my first status conference on this case on December 17, 2024, when parties do not reach agreement and a bankruptcy court grants a section 1113 motion, the court typically gives the debtor authority to reject the CBA, sometimes replacing that CBA with the rejected proposal and sometimes replacing it with no CBA at all.  *See, e.g.*, *Mission Coal*, 2019 WL 1024933, at *34 ("[T]he elimination of collective bargaining agreement obligations is not new or novel in bankruptcy cases."); *Walter Energy*, 542 B.R. at 899 (same); *Patriot Coal*, 493 B.R. at 137–40 (authorizing CBA rejection).  The preference is an agreed go-forward solution, but rejection of a CBA in its entirety is unambiguously permitted by section 1113.

15

IV.

So, it is clear to me based on the evidence at trial that unless the facts materially change, the CBA will need to be rejected, with or without Local 1's consent, for VMR to confirm a chapter 11 plan. The undisputed evidence at trial makes that clear, and Local 1 chose not to call any witnesses disputing that point or any of Mr. Robertson's other testimony.[5]

Those realities do not, however, permit me to grant the Debtor's current motion, because to do so I would need to find that Local 1 rejected the actual proposal made (VMR Ex. 1) without "good cause." I can't make that finding. Local 1's response to VMR's proposal explained that Local 1 did not control the Fund and did not have the ability to force the Fund to reduce its claim. (VMR Ex. 3) That is true. Local 1's letter did explain just how easy it would have been for the Fund (led by 3 union trustees and 3 VMR trustees) to have said "yes," or for Local 1 to have facilitated the Fund's participation in a negotiation, but that does not change the reality that I can only hold Local 1 responsible for the conduct of Local 1.

Section 1113 requires a debtor to demonstrate that the affected union has "refused to accept [its] proposal without good cause." 11 U.S.C. § 1113(c)(2). Once a debtor establishes that its proposal is necessary, fair, and in good faith, an objecting union must produce sufficient evidence to justify its refusal to accept the proposal. *See, e.g.*, *In re Nw. Airlines*, 346 B.R. at 328; *Walter Energy*, 542 B.R. at 895 (same); *Alpha Nat. Res.*, 552 B.R. at 336 (same). Thus, the way the statute was written, if a debtor satisfies the procedural prerequisites for a section 1113 motion, and its proposal is made in good faith, there is almost never good cause to reject it. As one court described, "almost invariably, 'if a debtor-in-possession goes through the procedural

---

[5]   Mr. Robertson also testified that his proposal would treat all unions and creditors fairly and equally (Dkt. No. 340, 3/5/25 Hr'g Tr. 46:19-21) as, among other things, VMR was not proposing to pay any other union more than Local 1 (*id.* at 46:22-24). This testimony was undisputed.

16

prerequisites for its motion, and if the substance of the proposal ultimately passes muster

. . . , its union(s) will not have good cause to have rejected the proposal.'" *Ass'n of Flight*

*Attendants–CWA, AFL-CIO v. Mesaba Aviation, Inc.*, 350 B.R. 435, 461 (D. Minn. 2006) (quoting

*In re Mesaba Aviation, Inc.*, 341 B.R. 693, 755 (Bankr. D. Minn. 2006)).  In other words, where a

proposal is necessary for a debtor to confirm a plan and the other statutory requirements are met,

no good cause exists to reject the proposal.  *See Id.* at 462 ("While the low wages imposed by the

Proposals understandably motivated the Unions to reject the Proposal, they do not constitute good

cause under the Bankruptcy Code."); *see also In re Ala. Symphony Ass'n*, 155 B.R. 556, 577

(Bankr. N.D. Ala. 1993) (union rejected the proposal without good cause where it merely insisted

that the debtor comply with the terms of the CBA before beginning negotiations even though the

union "knew that the [debtor] did not have the funds to pay them") (*aff'd in part, rev'd in part on*

*other grounds*, 211 B.R. 65 (N.D. Ala. 1996)).

It is critical to understand that as part of the statutorily directed give-and-take of section

1113, a union cannot demand the impossible from a debtor.  *See, e.g.*, *Nw. Airlines*, 346 B.R. at

328; *Karykeion*, 435 B.R. at 684 (holding that union failed to show good cause for rejecting

proposals where the union made no counterproposal concerning the proposed elimination of the

successorship provisions in the CBAs and continued to make demands the debtor could not

meet); *In re Maxwell Newspapers, Inc.*, 981 F.2d 85, 90–92 (2d Cir. 1992) (a lack of good cause

may be demonstrated by union demands that are impossible for the debtor to meet and failure to

offer alternatives that take into account the debtors' plan); *Mission Coal*, 2019 WL 1024933, at

*30 ("'Good cause' does not include demands that are not economically feasible or alternatives

that would not permit the debtor to reorganize successfully."); *Walter Energy*, 542 B.R. at 895–

96 (same).  For that very reason, while the debtor can (and often does) propose that unions make

17

material sacrifices pursuant to section 1113 where doing so is necessary to its reorganization, the same is true in reverse: a debtor cannot demand something that a union is legally unable to do. If, as in *National Forge*, "[t]he Union's insistence that the Debtor provide something which was not within its control indicates that the Union's refusal to accept Debtor's proposal was without good cause," 289 B.R. at 812, then a debtor's insistence that a union do something not within *its* control must indicate that the union *did* have good cause to reject the proposal.

For that reason and that reason alone, I cannot grant the motion filed by VMR at this time. The only proposal made by VMR to Local 1 demanded that a third party which Local 1 did not control make concessions. Local 1, quite literally, could not say "yes" to the proposal. Section 1113 does not permit me to authorize rejection of the CBA under those circumstances because Local 1 had "good cause" for saying "no" to doing something it could not legally do.

But as described above, nothing about this changes the reality facing all of the parties in this chapter 11 case. There is no reason to believe that the CBA can survive reorganization. So, if VMR proposes to simply reject the CBA and provide Local 1 employees with go-forward terms of employment similar to what Mr. Robertson testified at trial they would be, it is hard to see any justification (let alone "good cause") for Local 1 rejecting such a proposal. Such a proposal could permit VMR to reorganize; it would likely lead to any allowed claim from the Fund being treated exactly as VMR has suggested. Local 1 would likely be in a better position than it is in today because VMR could employ its members; its members would certainly benefit. And the Fund would be able to achieve at least some recovery under a confirmed plan—a recovery likely higher than what it could obtain should VMR have to close its doors. Again, I'm hopeful that after reading this opinion, the parties will resume discussions in this direction, but if they do not, all parties retain their rights under the Bankruptcy Code.

18

V.

For the reasons stated above, the Debtor's Motion to Authorize the Debtor to Modify the

Collective Bargaining Agreement of Structural Iron Workers Local No. 1 (Dkt. No. 297) is

denied without prejudice.  A separate order will issue.


Signed:　April 1, 2025　　　　　By:　　　　　　　　　　　　　　　　　　　

　　　　　　　　　　　　　　　　　　MICHAEL B. SLADE
　　　　　　　　　　　　　　　UNITED STATES BANKRUPTCY JUDGE